CANFIELD (REED v.). See Case No. 11,641.

## Case No. 2,382.
### CANFIELD v. STATE NAT. BANK OF MINNEAPOLIS.

[23 Int. Rev. Rec. 319; 1 N. W. (O. S.) 173; 1 Thomp. Nat. Bank Cas. 312; 2 Cin. Law Bul. 238.]

Circuit Court, D. Minnesota. Sept. 14, 1877.

RIGHTS AND POWERS OF NATIONAL BANKS — PRELIMINARY INJUNCTION—WHEN GRANTED.

[1. Under Rev. St. § 5136, par. 7, granting national banks such incidental powers as may be necessary to carry on the business of banking, a national bank may accept stock and notes for which it was given as security, as collateral security for a loan to the holder thereof, and may sell the stock at any time after the loan becomes due.]

[See note at end of case.]

[2. The power to sell the stock is unaffected by the fact that the notes and the loan have been long overdue.]

[3. Where complainants' equity is not clear, and reasonable doubt exists as to the facts upon which a motion for a preliminary injunction is based, it should not be granted unless it appears that the act sought to be enjoined will work irreparable injury.]

[In equity. Bill by Thomas H. Canfield against the State National Bank of Minneapolis and the Minneapolis Agricultural & Mechanical Association, to establish an equity in stock and property of the defendant corporation the agricultural association.]

In this cause a motion is made for an injunction, and is heard upon bill, and answer used by defendants as an affidavit, and a counter affidavit. The allegations in the bill of complaint are, briefly, that the complainant is the owner of about sixty-five acres of land in Hennepin county, in this district, of which he is in possession, and that the defendants claim some interest therein adverse to him, and he desires that the respective claims may be litigated. He states that the Minnesota Agricultural & Mechanical Association, was organized in June, 1871, as a body corporate, with a capital stock of $40,000, represented by shares of $50 each, all of which was taken by certain parties therein named, and that the corporation, soon after its organization, purchased the land now in the possession of the complainant, for the sum of $10,000, and erected buildings upon the same of equal value. That the object of the association, and the purpose for which the property was purchased and the buildings erected, were confined to holding fairs, of which one or two were held during 1871, and none since. That the real estate was placed under the control of William S. King, one of the stockholders, and a director, to be used by him as he saw fit, a majority of the stock being owned by him; and that prior to August 14, 1873, he had purchased and acquired the stock of the corporation, and that it had been transferred to him by the other holders and owners. Also, that King had, prior to the above date, acquired the real estate in fee, and free from all claims and demands of the association, and of each of the other directors and former stockholders, with an obligation on the part of the association to make and execute a conveyance of the same to King, his heirs and assigns, or to such person as he might designate as grantee. The bill further states that the complainant contracted with King for the purchase of the real estate, August 14, 1873, and the same was finally consummated and deeds were executed and delivered to him by King, and also by all of the

directors of the association, but no delivery of any stock was made as he states on account of his forgetfulness and inadvertence in requesting it. It also appears substantially in the bill, that Brackett, one of the directors, borrowed money of the bank in April, 1873, for which he gave his note and transferred as collateral to it, two hundred shares of stock of the Agricultural and Mechanical Association, and three promissory notes of Wm. S. King, dated in November, 1872, for the payment of which the stock had been pledged; and also that R. J. Mendenhall, one of the directors of the association, borrowed money from the bank and gave his note and transferred as collateral, one hundred shares of stock and certain notes of Wm. S. King, dated 1872, for the payment of which the stock had been pledged. It is charged that the bank has no title whatever or claim to the remaining five hundred shares of stock, and that it was never deposited as collateral, or pledged in any manner. The maturity of the notes for which the shares of stock were pledged is alleged, and that the bank is about to sell them at public auction, having given notice thereof.

The answer of the defendant the bank denies the material allegations in the bill as above stated, but admits that it holds the three hundred shares of stock substantially as therein set forth, and also states that in July, 1873, King, owner of the five hundred shares remaining, borrowed certain gas stock, property of R. J. Baldwin, the cashier of the bank, to enable himself to raise a certain amount of money, and in consideration of the loan, transferred the five hundred shares to Baldwin, as security for the return of the gas stock, and also to retain as additional security for the payment of the Brackett and Mendenhall notes, held by the bank. It is charged that the security taken by the bank is in violation of law, and an injunction is asked restraining the sale of the stock by the bank.

Palmer & Bell, for the motion.
George Bradley, contra.

NELSON, District Judge. The shares of stock held by the bank are a security not objectionable, in my opinion, to section 5136, par. 7, Rev. St. U. S. If so, the right to sell three hundred shares pledged as collateral to the King notes, originally given Brackett and Mendenhall, is not doubtful. A second pledgee holds the security to the extent of the debt for which it is pledged, and can sell at any time after the debt is due and payable. It is optional with the bank to stand to its remedy against the pledge or sue for its debt, and the law gave it the right to sell, ex mero motu, on proper notice of an intention so to do, or to file a bill in equity to foreclose and sell under a decree. 2 Hill. Mortg. Append. 526. Although

the King notes and the Brackett and Mendenhall notes had been overdue a long time, it is not deprived of this privilege given by law to select its remedy.

It is charged that the bank has no title to the remaining five hundred shares of stock, and that the same have not been pledged or deposited with it as a collateral security for any sum whatsoever, or with any right to sell. The answer of the bank, which was used upon the motion as an affidavit, denies this allegation, and the counter affidavit and exhibits produced by the complaint do not overcome, but rather support, the substantial claim set up in the answer by the bank to a lien upon this amount of stock. Applying the usual rule on motions of this kind, the complainant's equity is not so clear as to entitle him to an injunction, for there is reasonable doubt as to the facts upon which the motion is based, and the injury resulting from a sale of the stock is not irreparable. The purchaser would take only such title as the pledgor had at the time the security was given, and the rule of caveat emptor will govern.

Having come to a conclusion adverse to the complainant's application for the reasons stated, it is not proper to consider, at this time, the effect of the judgment set up in the answer as a defence, in a case in which the parties are substantially reversed. Motion for injunction denied.

[NOTE. After denial of the application for an injunction to restrain the sale, on September 15, 1877, the 800 shares of stock were sold by the bank to one J. M. Knight. Knight thereafter transferred 720 shares of the stock to Dorilus Morrison, and on February 25, 1878, the agricultural association by its directors, elected for that purpose by Knight and Morrison as sole stockholders, conveyed the real estate to them in the following proportions: Nine-tenths thereof to Morrison, and the remaining one-tenth to Knight. On October 28, 1878, Morrison conveyed his undivided interest in the real estate, and his 720 shares of the capital stock, to Jacob K. Sidle and Robert B. Langdon, by deed adsolute, but in fact to them as trustees for a number of persons. On August 14, 1880, complainant filed a supplemental and amended bill, to which he added, as parties defendant, Knight, Morrison, Rufus J. Baldwin, to whom the 500 shares had been delivered as collateral security for the return of certain gas stock, Sidle, Langdon, and William D. Washburn, S. W. Farnham, James A. Lovejoy, and George A. Brackett, persons for whose benefit the deed to Sidle and Langdon was executed, setting forth that, at the time of the sale, the bank had in fact no lien on the stock, having settled King's indebtedness by the acceptance of certain Northern Pacific Railroad bonds, and seeking to charge Sidle, Langdon, and Knight as holders of the legal title to the stock and the property represented by it in trust for the complainant, and praying for an account and a conveyance. The circuit court rendered a final decree in favor of complainant establishing his equity as prayed for, subject to the payment to Knight of $569.58, and to Sidle and Langdon the sum of $8,646.55. See 14 Fed. 801. From this decree the defendants appealed to the supreme court.

[Prior to the filing of the bill, and in October, 1873, defendant the State National Bank, and Baldwin, its cashier, brought an action

against Canfield in the Minnesota state court, to which action neither King nor the association were parties, wherein it was finally adjudged by the supreme court of that state that Canfield never acquired any title to the real estate from the agricultural association; that the defendant bank was the bona fide holder of the stock as collateral security, and had a right to have the property of the corporation applied to its redemption. but that Canfield was the equitable owner of said stock, subject to the rights of the bank. See Baldwin v. Canfield, 26 Minn. 43.

[On the hearing of the appeal from the circuit court. the supreme court of the United States, Mr. Justice Matthews delivering the opinion. held that the judgment of the Minnesota supreme court conclusively established for the purposes of the case, that the deed to Canfield was void. and that his equity to the stock was inferior to that of the bank; that the agreement between King and the bank as to the railroad bonds did not operate as a release of the latter's lien upon the stock, and that, in the exercise of the privilege of redemption, Canfield should be charged the sum of $12,430.33, the amount paid by Morrison for the nine-tenths of the stock; and, as thus modified, the court affirmed the decree of the circuit court, and remanded the cause for further proceedings. Minneapolis Ass'n v. Canfield, 121 U. S. 295, 7 Sup. Ct. 887.]